UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| RHONDA RINGER, | ) | CIV. 04-5114-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING THE |
| JO ANNE B. BARNHART, | ) | COMMISSIONER'S |
| Commissioner, Social Security | ) | DECISION |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Rhonda Ringer, moves for reversal of the Commissioner of Social Security's decision denying her application for disability insurance benefits and supplemental security income under Titles II, XVI, XVIII, and XIX of the Social Security Act. Defendant opposes the motion. The court reverses and remands the Commissioner's decision denying benefits.

**FACTS**

Ringer was born on August 22, 1970, in Britton, South Dakota. She did not graduate from high school, but received her GED between 1986 and 1988. (SR. 83, 87). Ringer has two children. She lives in Rapid City, South Dakota, and is not currently employed.

In 1986, when Ringer was fifteen years old, she was thrown from a motorcycle, flew several feet through the air, and landed in a straddle position atop a barbed wire fence. Ringer incurred a great deal of injury

from the accident including a pelvic fracture, internal organ damage, and a great deal of pain. (SR. 173). Her subsequent medical conditions mostly stem from the 1986 accident. After the accident, Ringer briefly owned a custom motorcycle business and held jobs as a nursing assistant, an assembler of computer boards, a waitress, and a babysitter. (SR. 78). She worked most often as a waitress. In this capacity, she was required to walk, stand, lift ice and heavy trays, and pick up garbage. She used machines, technical knowledge, and writing skills. She reported the heaviest lifting completed as a bar waiter was 50 pounds and that she frequently lifted 10 to 25 pounds. Ringer was a supervisor of two to three employees during her time as a bar waiter. (SR. 76). Although Ringer worked 40 hours a week in the beginning of her career, that number was gradually reduced to between 20 and 35 hours. In November of 2001, Ringer's injuries became too painful to her and she stopped working altogether. (SR. 77).

The earliest medical evaluation in the record is a March 27, 2001, report of a visit to the Rapid City Medical Center for a pap smear. (SR. 146). The earliest medical evaluation related to Ringer's disability is a July 15, 2002, depression diagnosis by Dr. Thatcher. During this evaluation Ringer denied having any chronic medical problems, but complained of increased anxiety, loss of joy in life, and loss of control. Ringer did not express suicidal ideation, but did have some thoughts of hurting herself or others. (SR. 232). Dr. Thatcher prescribed Paxil to combat the depression, but after

two and a half weeks of treatment, Ringer continued to complain of anxiety. (SR. 231).

On March 10, 2003, Ringer told Dr. Elston that she had experienced back pain since the time of her motorcycle accident in 1986.  She explained that since the accident she suffered from left leg pain, shooting pains, foot drop of the left foot, and altered sensation in her left leg.  Although Ringer wore a corset to ease the pain at the time of the evaluation, she said that she experienced back and left leg pain more often than not.  She also explained that two weeks prior to the evaluation she experienced an episode during which she was unable to move.  (SR. 229).  Following this evaluation by Dr. Elston, Ringer underwent a series of procedures and evaluations.

On March 14, 2003, turbo echo spin images were taken from the superior aspect of T12 through the inferior aspect of S1.  They were also performed from L3-4 through L5-S1.  At L2-3, the images revealed dehydration and degeneration of the disc.  There was some bony reactive change of the opposing endplates and some minor osteophyte which narrows the AP diameter to the spinal canal minimally.  There was no significant impingement on thecal sac or nerve roots, but there was minor facet joint degenerative disease.  At L3-4 and L4-5, there was mild facet joint degenerative disease, but no significant disc protrusion.  L5-S1 demonstrated essentially a normal appearing disc.  There was no significant

impingement on thecal sac or nerve roots, but again, there was facet joint degenerative disease and some mild overgrowth.  (SR. 165).

On March 17, 2003, Ringer had a neurological consultation with Dr. Rice at the Spine Center.  Dr. Rice determined that Ringer was suffering from very mild degenerative changes at C4-5 and C5-6.  She demonstrated subtle degenerative changes within the intervertebral disc spaces and facet joints at L4-5 and L5-S1.  Dr. Rice noted that Ringer suffers from depression and multiple traumas.  (SR. 177).

On March 21, 2003, whole body images were taken of Ringer's body after she was injected with a dye.  The whole body images appeared "normal," but the SPECT images revealed asymmetry at the level of the SI joints with decreased activity on the right.  The decreased activity was due to a rotation of the pelvis.  There was increased uptake at the vertebral body level on the left at the upper lumbar spine at approximately L1-2 or L2-3, consistent with minimal degenerative change.  (SR. 159).

On April 2, 2003, Ringer was examined by Dr. Marrs.  He determined that Ringer had a slightly shortened leg on the left estimated at about 1 cm, that she stands with her pelvis not quite level, and that she has some flattening of the lumbar spine.  Dr. Marrs' findings revealed multiple pelvic fractures healed in a nonanatomic position with some slight obliquity in rotation to hemipelvis relative to one another.  Ringer had about 1 cm of radiographic shortening and a small amount of widening of the sacroiliac

4

joints.  Ringer had both patellofemoral syndrome and knee instability

related to posterior cruciate instability.  Dr. Marrs recommended physical

therapy and a shoe lift to address the patellofemoral syndrome and to

stabilize the knee.  He also determined that if there were unsatisfactory

relief from therapy and instability persisted, reconstruction might be

necessary.  (SR. 192).

Ringer visited Dr. Lawlor on April 10, 2003.  He completed axial scans

of disks L2-3 and L4-5.  Dr. Lawlor also completed a provocative lumbar

discography by injecting a mixture of Isovue 300 and Ancef into the L4-5

disc and the L2-3 disc.  Large bony anomalies prevented taking images of

L5-S1.  At L2-3 there was mild disk degeneration with extension of contrast

to the posterior disk margin.  There appeared to be mild diffuse disk bulging

but no fracture disk herniation was seen.  At L4-5, there was contrast

contained centrally within the disk, but it appeared normal overall.  There

was mild degenerative change of the left L4-5 facet.  The most inferior

images showed what appeared to be partial sacralization of the left half of

the L5 vertebral body.  There was some articulation between the lower left

lateral half of the L5 and the upper sacrum and some mild sclerosis at this

level.  (SR. 161, 168).  Results of the discography revealed discogenic pain at

L2-L3 with severe degenerative disc disease at L5-S1.  Dr. Lawlor noted that

the discogenic pain at L3 appeared to be the cause of Ringer's problems and

explained her pain.  He also noted that some of her pain could come from
L5-S1.  (SR. 172).

On April 15, 2003, Ringer began a physical therapy regime.  At that
time she describe her life as not active, but said she engaged in exercise
including stretching, leg lifts, and sit-ups three times a week for thirty
minutes at a time.  She also reported being limited in her ability to sit for
more than five minutes, being unable to kneel, and experiencing pain when
walking.  Ringer's lower extremity range of motion was within functional
limits bilaterally, but she demonstrated multidirectional instability of the
left knee, decreased control of the left lower extremity, and decreased
strength of the left lower extremity.  She also demonstrated a leg length
discrepancy with the left being shorter.  Ringer set a goal of improving
muscles around her left knee and upper inner thigh.  In order to achieve
that goal she was to maintain a home exercise program to include range of
motion and strengthening exercises and insertion of a lift into her shoe.
(SR. 187).  Ringer continued physical therapy throughout the next two
months, attending appointments five times in April and five times in May.
Although Ringer initially experienced some relief from the pain, she
gradually became unable to complete her home exercises and her condition
reached a plateau.  (SR. 184).  On June 11, 2003, Ringer complained to
Dr. Marrs that physical therapy had aggravated her symptoms despite
improving them originally.  Although she complained of multi-factorial lower

6

extremity pain, she declined back surgery and noted an improvement in patellofemoral symptoms. (SR. 191)

On April 25, 2003, Ringer visited Dr. Becker with complaints of headaches.  Ringer stated that she had suffered headaches throughout the past few years.  She explained that her headaches lasted between a few hours and two days.  Ringer questioned whether the pain starting from the top of her skull was the result of the trauma of a bar stool falling on her head two or three years earlier.  Dr. Becker reported that the headaches were largely tension in nature and should be treated with anti-inflammatory medication.  (SR. 227).

On July 8, 2003, Dr. Vander Woude, a DDS non-examining physician, completed a Functional Capacity Assessment.  Dr. Vander Woude diagnosed Ringer as suffering from mild degenerative changes to her cervical and lower spine, left leg posterior ligament impairments, and depression.  Ringer's cervical spine and thoracic area were described as good and her lumbar area was described as adequate.  Dr. Vander Woude noted that Ringer's left leg was shorter than her right leg.  He recommended that Ringer stoop and crouch only occasionally and that she never kneel or crawl.  Dr. Vander Woude established no manipulative, visual, or communicative limitations, but did suggest that Ringer avoid heights.  Dr. Vander Woude opined that the symptoms were attributable to medically determinable impairments, but that the severity or duration of the symptoms was disproportionate to the

7

expected severity or expected duration on the basis of Ringer's medically determinable impairments.  A handwritten note on the evaluation reads: "Symptoms of pain and self-limitation of activity seem somewhat disproportionate to objective findings in chart."  (SR. 137).

At an appointment with Dr. Thatcher on January 27, 2004, Ringer complained of increased back and neck pain.  (SR. 224).  On March 9, 2004, Ringer was examined again by Dr. Knudson who determined that Ringer had chronic low back pain, neck pain, and leg pain secondary to trauma in 1986 which was worsening in discomfort.  Dr. Knudson recommended Ringer continue physical therapy while waiting for an appointment with Dr. Schleusener.  Dr. Knudson also recommended the regular use of Naprosyn and noted that Ringer will need more Flexeril.  Dr. Knudson opined that most of Ringer's symptoms were likely the result of trauma and degenerative arthritis.  Ringer admitted to Dr. Knudson that she may be somewhat depressed, but stated that she prefers not to try antidepressants. (SR. 222).

On March 17, 2004, Ringer was seen for outpatient screening at Rapid City Regional Hospital.  Her pain had continued to worsen and she said she wanted back surgery.  Ringer said there was no comfortable position in which to sit, stand, or move.  The only thing that alleviated her pain was laying on ice with her legs under pillows.  Ringer also reported exercising twenty minutes a day, six to seven times a week.  She usually

8

does body flex and stretches.  (SR. 202).  Ringer returned to physical
therapy six times in March 2004, and twice in April 2004.  At each session
she completed the following exercises: walking forward, walking lateral,
bicycling, horizontal shoulder abduction, hip abduction, and hip flexion.
Physical therapy reduced Ringer's pain and she decided back surgery
should be delayed for two years.  (SR. 206).

On April 6, 2004, Ringer was evaluated by Dr. Schleusener who
characterized Ringer as a reasonable and accurate historian regarding her
own condition.  Dr. Schleusener noted an elevation of Ringer's right
hemipelvis.  Dr. Schleusener opined that Ringer's pain is likely related to
her motorcycle accident.  Dr. Schleusener noted that she had a fracture
through the sacral ala and probably some inflammatory and scarring issues
at the lumbosacral plexus.  A lumbar fusion was not in her best interests.
Dr. Schleusener noted that Ringer had already experienced extensive
conservative treatment and recommended pain management.  (SR. 196).

On April 14 and April 15, 2004, Ringer's psychiatric condition was
evaluated by Nancy Winfrey.  Winfrey determined that Ringer had no
medically determinable mental impairment and that her capabilities were
not affected by her medical impairment.  (SR. 236, 250).

A Medical Assessment of Ability to do Work-Related Activities was
completed by Dr. Knudson on April 13, 2004.  Dr. Knudson found that
Ringer was limited to lifting up to 5 pounds frequently, 5 to 10 pounds

9

occasionally, and never over 10 pounds as a result of chronic low back and leg pain secondary to motor vehicle accident.  Standing, walking, and sitting are all affected by Ringer's impairments, but Dr. Knudson does not specify how or to what extent.  Ringer had symptoms from medical conditions which can be expected to require her to lie down or assume a recumbent position during an 8-hour work day.  Dr. Knudson noted that Ringer should lie down between 1 to 2 hours during an 8-hour work day.  Dr. Knudson also opined that Ringer was not able to work an 8-hour day, five days per week, on a continuing and sustained basis.  She was able to work approximately 4 hours a day on a continuing and sustained basis.  She had medical impairments that could reasonably be expected to result in unscheduled absences from work and should be expected to miss four or more days a month due to her impairments.  However, Dr. Knudson stated that "[t]he above statements are based on the level of chronic pain that the patient describes to me.  I have performed no functional disability exam, therefore I must refrain from indicating exact limitations." (SR. 233).

In May of 2003, Ringer explained that she receives aid from Ron Foster, a friend, in transporting her and in shopping.  She also said that she needed help lifting, loading, and hauling things like laundry, cleaning supplies, and groceries.  From August 2002 through February 2003, Ringer worked 3 to 9 hours a day, 25 to 40 hours a week as a baby-sitter.  She played with the children, fed babies, changed diapers, rocked the children,

10

dressed them, and cleaned them.  The work required some walking, a little standing, some stooping, a little crouching, and a lot of grabbing and reaching.  The work also required lifting the children from the floor to the changing table, and in and out of a crib or play pen three to four times a day.  The heaviest lifting was 10 pounds and that amount was lifted frequently. (SR. 118).  At an appointment with Dr. Knudson on December 30, 2003, Ringer complained of fatigue and explained that she slept 8 or 9 hours a night uninterrupted.  She also explained that she naps two times a week and that she is tired 90 percent of the time.  (SR. 226). Ringer again complained of fatigue during an evaluation by Dr. Thatcher. Although Ringer suspected the fatigue was a result of depression and anxiety concerning visits from her ex-boyfriend, medical causes were ruled out by lab tests.  Ringer also complained of increased back and neck pain, but stated that she was not ready to resort to back surgery.  (SR. 224).

At the hearing in front of the ALJ, Ringer was the only person to testify.  She claimed disability based on lower back pain, leg pain, and neck pain.  Ringer also testified that the pain in her left leg is constant although there are times when the pain is worse.  She estimated that when her back pain is at its worst, it is an 8 out of 10, where 10 is the worst pain imaginable.  She also testified that constant numbness accompanies the pain in her left leg that extends to her toes.  Ringer also has constant neck pain in the upper part of her neck that she estimated is an 8 out of 10 at its

11

worst.  To get relief from the pain, she has to lay down, prop up her legs, and put ice on them.  On an average day, she does this two or three times between 9 a.m. and 5 p.m.  Each icing session lasts 20 minutes to an hour.

A typical day for Ringer consists of waking between 6:30 and 7 a.m. Sometimes her back hurts so much in the morning that she immediately puts her legs up and ices them.  She then does some stretching exercises and then makes breakfast for her daughter and her son.  After her son leaves for school, Ringer dresses her daughter and spends time with her. They sit in a rocking chair and read.  Around noon, Ringer lays down for a nap for about an hour or more.  After her nap, Ringer eats lunch and then takes it easy until her son gets home from school.  This consists of lying down, reading, and resting.  The only activity that takes place in the afternoon is an occasional walk before supper.  Ringer makes supper and then cleans the kitchen.  Sometimes she is unable to clean and ices her legs instead.  Shortly thereafter she puts her children to bed.  After they are asleep she ices her legs again, writes in her journal, reads, and then goes to sleep.

Ringer testified that on a typical day she can walk three to four blocks.  She testified that she can stand for about 15 to 20 minutes, sit for one half hour at a time, and lift 5 to 10 pounds safely.  She also testified to having difficulty bending over and stooping, stating that those activities aggravate the pain.  She has little or no problem combing her hair, taking a

12

bath, and doing other personal care activities.  She also testified that she

was able to do housework other than heavy lifting.  She said she does not

mop, but instead gets down on the floor and wipes the floor on her hands

and knees.  Ringer testified that reading is the only hobby she participates

in now.  She said that she attends church functions at times and that her

daughter attends Youth and Family Services Early Head Start, but that

those were her only activities.  Ringer testified that she does not garden and

does not shovel snow.

## ALJ DECISION

Ringer filed an application for disability benefits in 1986 and was

denied on June 1, 1986.  On April 28, 2003, Ringer applied for Disability

Insurance Benefits and Supplemental Security Income claiming an onset

date of November 8 or 9, 2001.  This application was denied initially on

July 10, 2003, and on reconsideration on September 11, 2003.  Ringer

requested a hearing in front of an ALJ which was held on April 15, 2004.

After applying the sequential five-step evaluation process,[1] the ALJ

_____

[1]The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to

concluded that Ringer was not entitled to benefits.  First, the ALJ
determined that Ringer had not engaged in substantial gainful activity since
the alleged onset date.  Second, the ALJ found that Ringer's disorders of the
back were considered severe.  Under the third step, the impairment did not
meet or equal the Listing of Impairments at 20 C.F.R. Pt. 404, Appendix 1,
Subpart P, Regulation 4.  Next, the ALJ determined Ringer's RFC by
reviewing medical records and testimony of witnesses.  The ALJ found that
Ringer's allegations regarding her limitations were not totally credible.  He
concluded that Ringer retains the residual functional capacity (RFC) to
perform light work.  The ALJ determined that Ringer's past relevant work
was that of assembler, waitress, bartender, and cook, and that these
occupations constituted light work and unskilled work.  He therefore
determined that Ringer retained the RFC to perform past relevant work.
The ALJ issued a Step-Four denial on June 15, 2004.  The Appeals Council
affirmed the ALJ on October 2, 2004.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by
substantial evidence in the record as a whole.  42 U.S.C. § 405(g); <u>Metz v.
Shalala</u>, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than

the Commissioner to prove that there are other jobs in the national economy
that the claimant can perform.  <u>Baker v. Apfel</u>, 159 F.3d 1140, 1143-44 (8th
Cir. 1998).

14

a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under § 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Furthermore, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  See also Smith v. Shalala, 987 F.2d at 1374.  The court must review the Commissioner's decision to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  The Commissioner's conclusions of law are only

15

persuasive, not binding, on the reviewing court.  <u>Smith v. Sullivan</u>, 982 F.2d at 311; <u>Satterfield v. Mathews</u>, 483 F. Supp. 20, 22 (E.D. Ark. 1979), <u>aff'd per curiam</u>, 615 F.2d 1288, 1289 (8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  <u>Smith v. Shalala</u>, 987 F.2d at 1374.

**DISCUSSION**

**A.    Impairments**

Ringer argues that the ALJ failed to address the entirety of her impairments.  The ALJ determined that Ringer suffered severe impairment from disorders of the back.  He also determined that Ringer did not suffer severe impairments of anxiety and depression.  (SR. 19).  Ringer claims that the ALJ failed to evaluate the severity of her patellofemoral syndrome, ligamentous laxity in the left knee, limb-length discrepancy, weakness of hip flexors, drop-foot, and cervical spine degenerative changes.  The Commissioner argues that all of Ringer's impairments are adequately encompassed by the ALJ's term, "disorders of the back" and that non-back-related impairments have no more than a minimal effect on Ringer's ability to do work.

At Step Two of the sequential evaluation, the ALJ should identify all severe impairments of the claimant.  <u>Baker v Apfel</u>, 159 F.3d 1140, 1143

16

(8th Cir. 1998).  An impairment is severe if it has more than a minimal effect on a claimant's ability to do work or if it significantly limits claimant's ability to do basic work activities.  See Johnston v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Bowen v. Yuckert, 482 U.S. 137, 107 S. Ct 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c) (1986)). Basic work activities include walking, sitting, lifting, pushing, pulling reaching, carrying, handling, capacity to see, hear, speak, understand and carry out instruction, responding to supervision, and dealing with changes in a routine work setting.  Id.  Impairments that are so slight as to make it unlikely the claimant would be found disabled considering age, education, and experience are not severe.  Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996) (citing Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995), Bowen v. Yuckert, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297, 96 L. Ed. 2d 119 (1987)).  The Social Security Regulations (SSR) state: "Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, are considered in making a determination as to whether your impairment or combination of impairment(s) is severe."  20 C.F.R. § 404.1529(d)(1). Determining that impairments are not severe requires a careful consideration of the objective medical evidence and informed judgment about the impairment's limitation on the claimant's ability to work.  SSR 96-3P, 1996 WL 374181 (S.S.A.).  Where impairments are not or cannot be

17

determined to be severe, sequential evaluation requires the ALJ to evaluate the effect the impairments have on the claimant's ability to do past work. SSR 85-28, 1985 WL 56856 (S.S.A.).

The ALJ directly considered Ringer's anxiety and depression.  Because the medical expert indicated that Ringer's anxiety and depression had no effect on her ability to understand, remember, and carry out instructions, or to respond to supervisors, co-workers, and work pressures, the ALJ determined that these impairments were not severe because they do not significantly compromise her ability to do work.  (SR. 19).  Because this determination is supported by substantial evidence in the record, the ALJ did not err in failing to include anxiety and depression as severe impairments.

The ALJ also discussed Ringer's "back disorders" at length.  Dr. Marrs noted that Ringer's bone scan showed significant findings only in the lumbar spine and not the pelvis, and he concluded that her lower back, pelvis, and left leg pain "seem[ed] to be coming from her back."  (Tr. 174).  In light of these findings, the court finds that the ALJ's term "disorders of the back" broadly and sufficiently encompasses the medical problems related to her pelvis and left leg.  Similarly, her neck problems were also related to spinal degeneration and thus were adequately covered by the broad description of severe "disorders of the back."

18

Ringer also complains of left knee symptoms, limb length shortening, foot drop, and hip flexor weakness.  (SR. 20).  Only "severe" impairments that have more than a minimal effect on a claimant's ability to do work, however, need to be listed at Step Two.  <u>Baker</u>, 159 F.3d at 1143.  Because these disorders all began shortly after Ringer's 1986 accident and she continued working as a waitress, bartender, and a cook for almost 15 years, it was reasonable for the ALJ to conclude that these impairments had less than a minimal impact on her ability to perform basic work-related activities.  Therefore, the ALJ did not err at Step Two.

**B.      Onset Date**

Ringer claims that the ALJ had a duty to obtain medical evidence of the 1986 injuries and treatment for purposes of determining the disability onset date.  Ringer's impairments began with a traumatic event in 1986, but she never alleged that her disability began at that time.  Instead, she claimed an onset date of November 8, 2001, which was over eight years after the accident.

The ALJ has a regulatory duty to make a reasonable attempt to obtain relevant records:

> Our responsibility.  Before we make a determination that you are not disabled, we will develop your complete medical history for <u>at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary. . . .</u>

19

20 C.F.R. § 404.1512(d) (emphasis added).  Here, the case development sheet in the settled record notes that medical records were requested for treatment dates of November 2001 to present from Neurosurgical & Spinal Surgery, Black Hills Orthopedic & Spine, Black Hills Pain Clinic, Rapid City Regional Hospital, Black Hills Rehab Hospital, and Rapid City Medical Center.  (SR. 72-74).  Thus, the ALJ did develop Ringer's complete medical history for the 12-month period preceding Ringer's alleged onset date.  Because Ringer continued working until November of 2001, the ALJ had no reason to develop the record for an earlier period.

Ringer also complains that the ALJ failed to obtain additional chiropractic evidence that would have corroborated her complaints of pain.  While chiropractic evidence <u>may</u> be used to show the severity of an impairment under 20 C.F.R. § 404.1513(d), there is no binding duty on an ALJ to utilize chiropractic records for that purpose.

**C.   Credibility**

Next Ringer argues that the ALJ erred in finding her testimony not fully credible.  The court's "touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  <u>Anderson v. Barnhart</u>, 344 F.3d 809, 814 (8th Cir. 2003).  When evaluating a claimant's credibility relating to nonexertional complaints, the ALJ must consider all evidence regarding the claimant's subjective complaints, including:

> the claimant's prior work record, and observations by third
> parties and treating and examining physicians relating to such
> matters as:  1. the claimant's daily activities; 2. the duration,
> frequency and intensity of the pain; 3. precipitating and
> aggravating factors; 4. dosage, effectiveness and side effects of
> medication; [and] 5. functional restrictions.

Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (quoting Polaski v.

Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  While an ALJ need not

methodically discuss each Polaski factor, the factors must be acknowledged

and examined.  Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000).  The court

should defer to the ALJ so long as he cites reasons for discrediting a

claimant's testimony.  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).

Ringer argues that the ALJ erred because objective medical evidence

supported Ringer's subjective complaints.  Ringer relies on Jenkins v. Apfel,

196 F.3d 922 (8th Cir. 1999) in arguing that a claimant should be found

credible where objective medical evidence supports the claimant's subjective

complaints.  That case, however, was remanded because new evidence that

was not considered by the ALJ supported the claimant's credibility.  Id. at

926-27.  The court found that if the ALJ had considered the new evidence,

he would have adopted the assessment of the physicians instead of finding

the claimant not credible based on lack of objective findings.  Id.  Ringer has

presented no new evidence.  Therefore, the court does not find Jenkins

controlling in this case.

Accordingly, the court will apply the Polaski analysis and in doing so will not disturb the decision of an ALJ who seriously considers, but for good reason expressly discredits a claimant's subjective complaints, if those reasons are supported by substantial evidence in the record as a whole. Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir. 1999). "Where adequately explained and supported, credibility findings are for the ALJ to make." Lowe, 226 F.3d at 972.

### 1.    Daily Activities

The ALJ explored Ringer's daily activities at length. He noted that Ringer prepares meals for her children and tends to their personal needs as well as her own. He also observed that Ringer went to physical therapy two times a week, shopped for groceries once a week, went to club meetings and Youth and Family Services, and visited with family and friends. The ALJ focused on the fact that Ringer was able to care for the personal needs of her family and she was able to perform household chores without much assistance. He determined that these activities were not restricted and therefore were inconsistent with Ringer's subjective complaints. (SR. 20). The ALJ may reject allegations of disabling pain that are inconsistent with the claimant's daily activities and the medical evidence. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (finding testimony that claimant performed household chores is inconsistent with claims of disabling pain).

The ALJ did not err in concluding that Ringer's daily activities did not support a finding of credibility.

**2.     Duration, Frequency, and Intensity of the Pain**

Ringer argues that her persistence in seeking medical treatment militates toward a finding of disability.  The record, however, reveals that Ringer did not seek medical treatment for sixteen months following the alleged date of onset.  A lack of ongoing treatment disfavors a finding of disability.  Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).  Ringer also claims that the ALJ erred in discrediting her credibility because she worked after the date of alleged disability onset.  The ALJ noted that Ringer continued to work after the alleged onset date.  He was careful to point out that although the work did not constitute substantial gainful activity (SGA), it did undermine her credibility.  Working after impairment begins supports a conclusion of not being disabled.  See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).  The ALJ considered both Ringer's treatment history and her ability to work after commencement of impairment and properly determined that Ringer was not credible.

**3.     Precipitating and Aggravating Factors**

Ringer claims that the ALJ erred by not discussing her sclerotic vertebrae, back and leg pain, hip flexors, ligamentous laxity of the left knee, patellofemoral syndrome, cervical spine, and depression.  Although the ALJ

must develop the record fully and fairly, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000). Ringer is incorrect in arguing that the ALJ did not discuss these impairments. As previously noted, the ALJ specifically considered impairments including left leg disorders, pelvic problems, and neck pain, including left knee symptoms, the need to use a shoe lift, foot drop, and cervical spine degenerative changes. (SR. 20). But there would be no reversible error even if he had not expressly discussed the impairments so long as they were considered. In this case, there is no question that the ALJ considered these impairments and accordingly there is no reversible error on this issue.

### 4.    Functional Restrictions

Ringer asserts that the ALJ improperly relied upon a lack of significant findings by the treating and primary physician. Specifically, Ringer contends that the ALJ ignored restrictive findings by Dr. Knudson and the physical therapist. While evidence from a treating physician must be given great weight "with deference to the physician's findings over an examining physician or consultant," Morse v. Shalala, 16 F.3d 865, 872 (8th Cir. 1994), a treating physician's opinion is entitled to less weight when it is inconsistent with other substantial evidence of the record. Krogmeier v.

24

Barnhart, 294 F.3d 1019, 1023 (8ᵗʰ Cir. 2002).  The assessment performed by Dr. Knudson is inconsistent with the overwhelming evidence on the record and the assessment is a simple recitation of Ringer's subjective complaints.

Dr. Knudson's report opined that Ringer was limited in her ability to carry, that standing, walking, and sitting are all affected, that she should lie down between one to two hours during an 8-hour work day, that she was not able to work an 8-hour day, five days per week, on a continuing and sustained basis, and that she would have unscheduled absences from work four or more times a month.  (SR. 233).  The ALJ noted that Dr. Knudson's report was inconsistent with the reports of Ringer's other physicians.  Specifically, the ALJ noted that Dr. Schleusener did not list any restrictions, that Ringer was not considered disabled by any physician, and that no doctor suggested limitations greater than those in the ALJ's opinion.  (SR. 20-22).  Furthermore, Dr. Vander Woude established no manipulative, visual, or communicative limitations and opined that the symptoms were attributable to medically determinable impairments, but that the severity or duration of the symptoms was disproportionate to the expected severity or expected duration on the basis of Ringer's medically determinable impairments.  He found:  "Symptoms of pain and self-limitation of activity seem somewhat disproportionate to objective findings in chart."  (SR. 137).

The breadth of this evidence suggests Dr. Knudson's evaluation is anomalous.

Moreover, the ALJ noted that Dr. Knudson "performed no functional disability exam and based his [sic] opinions on the claimant's subjective statements." (SR. 20).  In fact, Dr. Knudson noted on the actual assessment that it was "based on the level of chronic pain that the patient describes to me.  I have performed no functional disability exam, therefore I must refrain from indicating exact limitations." (SR. 233).  The ALJ seriously considered Ringer's functional limitations and determined that Dr. Knudson's evaluation was inconsistent with the overwhelming evidence on the record. He therefore committed no error in giving it less weight when he determined that Ringer was not credible.

After considering all the Polaski factors, the court finds the ALJ did not err in his finding that Ringer was not credible.

**D.    RFC**

Ringer claims that the ALJ committed reversible error when he determined Ringer could perform a full range of light work by discrediting Dr. Knudson's assessment, failing to base Ringer's RFC on other available medical evidence, and failing to consider the non-examining state consultant's opinions.  The "ALJ bears the primary responsibility for

assessing a claimant's residual functional capacity based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000).

As noted above, the ALJ properly discredited Ringer's subjective complaints. Dr. Knudson's assessment was entirely based on Ringer's subjective complaints. The ALJ therefore properly discredited and accordingly gave less weight to Dr. Knudson's assessment. See Fair v. Bowen, 885 F.2d 597, 605 (9th Cir. 1989).

Ringer argues that the ALJ's RFC determination was not based on medical evidence. The medical records reveal, however, that Ringer retained full 5/5 motor strength and good range of motion. She walked without assistance. And she did not exhibit pain during straight-leg raising tests. (Tr. 172, 181-82, 196, 223, 229). Her whole body bone scan was normal, and other scans showed only "mild" or "minor" degenerative change. (Tr. 159, 161, 165-66, 183, 196). Dr. Schleusener determined that Ringer's spine x-rays "looked pretty good." (SR. 20). Moreover, Ringer's symptoms were improved through the use of a shoe lift and mild anti-inflammatory medications. (SR. 20). The availability of effective treatment of the impairments militates toward a denial of disability. Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001). It was the ALJ's duty to weigh the evidence and resolve any conflicts, and he did so in this case.

27

Ringer also argues that the ALJ failed to rationalize the discrepancy between the non-examining state consultant's assessment and the ALJ's RFC determination.  The non-examining state consultant, Dr. Vander Woude, found that Ringer should stoop and crouch only occasionally, and that she should never kneel or crawl.  He also found Ringer should avoid heights.  SSR 96-p states that "Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions."  The ALJ, however, did not discuss Dr. Vander Woude's opinion or explain the weight he gave to the opinion.  And he did not include the restrictions in Ringer's RFC.  Failure to consider the non-examining state consultant's opinion in formulating the RFC is error.

**E.    Past Relevant Work**

Finally, Ringer argues that the ALJ erred in determining at Step Four that Ringer could perform her past relevant work of assembler, waitress, bartender, and cook.  "Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it."  20 C.F.R. § 404.1560(b).  The Commissioner agrees that Ringer did not perform assembly work long enough for it to constitute past relevant work and that the job of cook is

beyond the RFC assessed by the ALJ.  This leaves the jobs of waitress and bartender.

Ringer reported that her past work as a waitress and bartender required lifting up to 50 pounds, which would constitute medium work, rather than light work.  The DOT, however, categorizes both of these jobs as light in exertion.[2]  SSR 92-61 provides that an individual will be found "not disabled" when it is determined she retains the RFC to perform the actual functional demands and job duties of her past work, or the functional demands and job duties of the occupation as generally required by employers through the national economy.  Thus, the ALJ properly found Ringer's past work as a waitress and bartender constituted light work.

Because the ALJ failed to properly formulate Ringer's RFC and consider further limitations on the full range of light duty work, however, this court finds that substantial evidence does not support the Commissioner's conclusion that Ringer is not disabled.  There is no evidence in the record that Ringer could perform the jobs of waitress and bartender, if subject to the limitations articulated by Dr. Vander Woude.

---

[2] DOT occupation #311.477-018 (waitress) (Strength: Light); DOT occupation #312.474-010 (bartender) (Strength: Light).

29

**CONCLUSION**

The ALJ properly considered Ringer's impairments, accurately determined Ringer's onset date, and carefully weighed Ringer's credibility. The ALJ, however, erred in determining Ringer's RFC and as a result, substantial evidence does not support the Commissioner's conclusion that Ringer is able to perform her past relevant work.  Accordingly, it is hereby

ORDERED that the decision of the Commissioner of Social Security denying Ringer's claim for disability insurance benefits under Titles II, XVI, XVIII, and XIX of the Social Security Act is reversed and remanded.

Dated August 23, 2005.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE